**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Charlotte D. Kirk,      :    Case No. 5:12 CV 1687
            :
   Plaintiff,      :
            :
v.           :
            :
Commissioner of Social Security,  :    **REPORT AND**
   Defendant,     :    **RECOMMENDATION**

## I. INTRODUCTION

Plaintiff Charlotte D. Kirk ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 17)[1] and Plaintiff's Response

(Docket No. 18). For the reasons that follow, the Magistrate recommends that the decision of the

Commissioner be affirmed.

---

[1] Defendant's Brief on the Merits was originally filed as Document Number 16 and mistakenly labeled by the government as "Plaintiff's Brief on the Merits." The government subsequently filed Document Number 17, which is identical to Document Number 16 except for the correction in the caption, which now reads "Defendant's Brief on the Merits." All references to the government's brief will be made to Document Number 17.

## II. PROCEDURAL BACKGROUND

On November 5, 2008, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 11, p. 117 of 485). On that same day,

Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381

(Docket No. 11, p. 114 of 485).[2] In both applications, Plaintiff alleged a period of disability beginning

April 1, 2008 (Docket No. 11, pp. 114, 117 of 485). Plaintiff's claims were denied initially on January

15, 2009 (Docket No. 11, pp. 60, 63 of 485), and upon reconsideration on May 20, 2009 (Docket No.

11, pp. 72, 79 of 485). Plaintiff thereafter filed a timely written request for a hearing on July 10, 2009

(Docket No. 11, p. 86 of 485).

On October 20, 2010, Plaintiff appeared with counsel for a hearing before Administrative Law

Judge Paul Gaughen ("ALJ Gaughen") (Docket No. 11, pp. 31-55 of 485). Also appearing at the

hearing was an impartial Vocational Expert ("VE") (Docket No. 11, p. 33 of 485). ALJ Gaughen found

Plaintiff to have a severe combination of a mood disorder variously diagnosed as depression and

bipolar disorder, a personality disorder NOS with borderline, dependent, and antisocial traits, alcohol

dependence, polysubstance abuse, peripheral neuropathy, minimal carpal tunnel syndrome in her right

extremity, and obesity with an onset date of April 1, 2008 (Docket No. 11, pp. 17-18 of 485).

Despite these limitations, ALJ Gaughen determined, based on all the evidence presented, that

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through the date of his decision (Docket No. 11, pp. 17-18 of 485). ALJ Gaughen

found Plaintiff had the residual functional capacity to perform light work with the following

---

[2]Plaintiff protectively filed for DIB and SSI on October 30, 2008 (Docket No. 11, p. 135
of 485).)

exceptions:

1.  Plaintiff cannot perform any work activities that require strong gripping with her right upper extremity.

2.  Plaintiff can only use her right upper extremity to perform fine manipulative actions, such as handling and fingering, for two-thirds of the workday and even then she cannot do so continually.

3.  Plaintiff can stand for approximately half of the workday but not all at once.

4.  Plaintiff can sit for at least six hours during an eight-hour workday.

5.  Plaintiff can work a full eight hours as long as she has a sit/stand option with normal breaks.

6.  Plaintiff cannot perform tasks that involve the use of foot controls.

7.  Plaintiff can handle simple adjustment but, due to mental health concerns, cannot readily adapt to significant changes in routine.

8.  Plaintiff cannot work in an environment that requires higher-level social interactions, especially with new and unfamiliar people. She would perform best with a predictable, set routine to follow.

(Docket No. 11, pp. 21-22 of 485). ALJ Gaughen found Plaintiff unable to perform any of her past relevant work, but able to perform other work in the economy (Docket No. 11, p. 25 of 485). Plaintiff's request for benefits was therefore denied (Docket No. 11, p. 26 of 485).

On June 29, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged: (1) the ALJ's decision was not supported by substantial evidence and improperly relied on Plaintiff's alleged substance abuse; (2) the ALJ wrongly dismissed Plaintiff's subjective complaints; and (3) the ALJ failed to present an appropriate hypothetical to the VE (Docket No. 15, p. 10 of 19). Defendant filed its Answer on September 7, 2012 (Docket No. 10).

## III.  FACTUAL BACKGROUND

**A.     THE ADMINISTRATIVE HEARING**

An administrative hearing convened on October 20, 2010, in Cleveland, Ohio (Docket No. 11, p. 31 of 485). Plaintiff, represented by counsel Sarah Cora, appeared and testified (Docket No. 11, p. 33 of 485). Also present and testifying was VE Thomas Nimburger ("VE Nimburger") (Docket No. 11, p. 33 of 485).

### 1.     PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a forty-one year old female with five children (Docket No. 11, pp. 48, 312 of 485).[3] Plaintiff testified that she has a tenth grade education but completed her GED in 1992 (Docket No. 11, p. 39 of 485). Plaintiff stated that she lived with someone, but did not provide the identity of this individual (Docket No. 11, p. 44 of 485). Plaintiff testified that she last worked in April 2008 and believed that her biggest obstacle in returning to work is her paranoia (Docket No. 11, p. 39 of 485). Plaintiff had a driver's license in the past; however, she did not currently

have a license (Docket No. 11, p. 49 of 590).[4]

Plaintiff gave testimony concerning a number of her alleged impairments, including her paranoia, anxiety, depression, and pain (Docket No. 11, pp. 39-47 of 485). With regard to her pain, Plaintiff stated that her worst pain occurs in her feet and lower legs (Docket No. 11, p. 41 of 485). She

---

[3] As of October 2008, three of these children were adults and the two minor children were in the custody of Plaintiff's aunt (Docket No. 11, p. 324 of 485). Plaintiff indicated that she has contact with all of her children (Docket No. 11, p. 312 of 485).

[4] Plaintiff's medical records indicate that her license and driving privileges were revoked in 2006 as the result of charges for Operation of a Vehicle Under the Influence ("OVI") and Failure to Maintain Insurance (Docket No. 11, p. 216 of 485).

described it as a burning pain and stated that her feet always feel "tight" and as though they are swollen, even though they are not (Docket No. 11, pp. 41-42 of 485). The pain is constant and does not respond to any type of treatment Plaintiff administers (Docket No. 11, pp. 41-42 of 485). Plaintiff also indicated that she suffers some pain in her hands, although she testified that this pain comes and goes and is usually only present when she tries to use her hands (Docket No. 11, p. 42 of 485). The pain in her right hand is a little bit worse than the pain in her left, and Plaintiff estimated that she could lift and carry approximately ten to fifteen pounds with her right hand (Docket No. 11, p. 42 of 485). Plaintiff indicated that she has pain in her lower back and neck, usually three to four times per week (Docket No. 11, p. 43 of 485). Plaintiff testified that she takes Neurontin for her pain, but claimed that the medication does not help (Docket No. 11, p. 44 of 485).

In describing her depression, Plaintiff indicated that she has crying spells and gets "real down" (Docket No. 11, p. 41 of 485). According to Plaintiff, she has tried to commit suicide five to six times since the age of thirteen (Docket No. 11, p. 41 of 485). Plaintiff stated that her medication helps with her depression, but also causes side effects such as twitching (Docket No. 11, p. 41 of 485).

Plaintiff testified most substantially about her paranoia and panic attacks. According to Plaintiff, she has a habit of thinking that other people are talking about her and then reacting to that fear (Docket No. 11, p. 40 of 485). Plaintiff also reported having hallucinations at least three times per week during which she feels like snakes are crawling all over her body (Docket No. 11, p. 40 of 485). Plaintiff described an incident where she actually tore off all of her clothes because this sensation was so strong (Docket No. 11, p. 40 of 485). Plaintiff could not identify any particular situation that triggers these hallucinations, stating that they can happen in her own home and have even awakened her  from sleep (Docket No. 11, p. 40 of 485). When asked, Plaintiff indicated that there was nothing

5

she could do to calm herself down once the hallucinations started other than wait them out or get someone to be with her so that she can feel safe (Docket No. 11, p. 41 of 485).

Plaintiff testified that she can leave the house as long as she is with someone she knows, and usually leaves her home once a day (Docket No. 11, p. 45 of 485). Plaintiff claimed that she usually does not get out of the car, but also stated that she can go into the grocery store (Docket No. 11, pp. 45-46 of 485). Plaintiff indicated that certain places trigger anxiety attacks, such as a crowded bus or a grocery store filled with strange people (Docket No. 11, p. 46 of 485). She stated that the panic attacks hurt "like real bad chest pains" and cause her to have breathing difficulties (Docket No. 11, p. 46 of 485). Plaintiff testified that the attacks occur four times per week without warning and she usually cannot prevent them from happening (Docket No. 11, p. 46 of 485).

Plaintiff also testified as to her residual functional capacity. She indicated that she can walk and stand for thirty minutes at a time (Docket No. 11, pp. 41-42 of 485), but then has to sit for a few hours before standing up again (Docket No. 11, p. 47 of 485). Plaintiff indicated that she does not do her own laundry because she cannot go up and down the stairs to get to the washer and dryer, but stated that she vacuums every now and then and washes a few dishes (Docket No. 11, pp. 44-45 of 485). When asked about her typical day, Plaintiff stated that she spends all day in front of the television (Docket No. 11, p. 45 of 485). Plaintiff indicated that she can follow a show from start to finish, although she sometimes finds it difficult to stay focused for longer periods of time (Docket No. 11, p. 45 of 485). Plaintiff indicated that she does not visit family or friends and no one visits her (Docket No. 11, p. 45 of 485).

### 2.  VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the

6

hearing, the VE described Plaintiff's past work as a fast food worker as light and unskilled and

Plaintiff's past work as a food preparer as medium and unskilled (Docket No. 11, pp. 47-48 of 485).

The ALJ then posed his first hypothetical question:

> . . . the worker presents with ability to do some light, sedentary exertion . . . She can do
> some light work, being able to do postural adjustments occasionally and to lift and carry
> objects, 20 pounds occasionally, or up to 10 pounds to lift frequently.
>
> But she needs a sit/stand alternating option. And cannot do strong gripping tasks on the
> right, which is her dominant hand. Assume there's some diminished gripping strength, and
> that fingering and handling could be done for up to two-thirds of the time on the right, but
> not continually.
>
> Consider that she could work on the feet standing or walking for half a work day and not
> all at once. Sitting would not be restricted. Could sit for at least six hours . . . in a work day.
> And with a sit/stand option could work eight of eight hours, allotted with normal breaks.
>
> The worker would not be a good candidate for work involving the use of foot controls. She
> can handle simple adjustments at work, but due to mental health issues, can't readily or
> critically adapt to significant changes in the work setting or routine.
>
> And while she can handle perfunctory social interchange at work, can give a perfunctory
> or routine greeting to customers and co-workers, she's not going to be able to engage in
> higher level social interaction, especially with new and unfamiliar people.
>
> And the worker does best with a predictable, relatively set routine to follow . . . Could she
> do the past relevant work?

(Docket No. 11, pp. 49-50 of 485). Taking into account these limitations, the VE testified that such an

individual would not be able to perform Plaintiff's past work (Docket No. 11, p. 51 of 485). The VE

stated that there was other light work that the hypothetical person could perform, including: (1) hand-

packager, listed under DOT 559.687-074, for which there are 140,000 positions nationally and 840

locally;  (2) mail clerk, listed under DOT 206.387-022, for which there are 130,000 positions

nationally and 910 locally; and (3) information clerk, listed under DOT 209.687-026, for which there

are 98,000 positions nationally and 520 locally (Docket No. 11, pp. 51-52 of 485).

ALJ Gaughen then changed the hypothetical to sedentary exertion, keeping all other limitations the same (Docket No. 11, p. 52 of 485). The VE indicated that this hypothetical claimant could perform other sedentary work including: (1) information clerk, listed under DOT 209.567-014, for which there are 120,000 positions nationally and 710 locally; (2) front-desk receptionist, listed under DOT 237.367-010, for which there are 130,000 positions nationally and 750 locally; and (3) sorter in the mailing house industry, listed under DOT 209.587-010, for which there are 95,000 positions nationally and 560 locally (Docket No. 11, pp. 52-53 of 485).

During cross-examination, Plaintiff's counsel added the limitation "that this person would be off task [twenty] percent of the time due to her paranoia and depressive symptoms" (Docket No. 11, p. 53 of 485). Based on this additional limitation, VE Nimburger testified that the hypothetical claimant would not be able to perform any other work (Docket No. 11, p. 53 of 485).

**B.    MEDICAL RECORDS**

**a.    PHYSICAL HEALTH ISSUES**

Plaintiff's medical records date back to November 6, 2008, when Plaintiff presented to the Summa Health System Emergency Room ("Summa ER") complaining of joint pain (Docket No. 11, p. 193 of 485). Plaintiff was diagnosed with acute joint arthralgias, given morphine, and discharged with prescriptions for Zofran and Percocet (Docket No. 11, p. 193 of 485). On November 10, 2008, Plaintiff went to the Barberton Hospital Emergency Room ("Barberton ER") complaining of leg, knee, and ankle problems (Docket No. 11, p. 210 of 485). Plaintiff stated that she had chronic swelling of her legs that got worse as the day went on (Docket No. 11, p. 210 of 485). Plaintiff was diagnosed with acute and chronic wrist pain and lower extremity peripheral edema (Docket No. 11, p. 210 of 485). She was given bilateral local wrist splints and Ultram (Docket No. 11, p. 210 of 485).

8

On November 13, 2008, Plaintiff saw Dr. Aashi Singh, DO ("Dr. Singh") complaining of generalized joint pain and swelling that had progressed to her legs (Docket No. 11, pp. 224, 275 of 485). Plaintiff described the pain as a numbness and tingling and indicated that her fingers and toes also go numb (Docket No. 11, pp. 224, 275 of 485). Dr. Singh diagnosed Plaintiff with inflammatory polyarthritis NOS (Docket No. 11, pp. 226, 277 of 485). Plaintiff returned to Dr. Singh on November 25, 2008, complaining of pain and swelling and difficulty sleeping (Docket No. 11, pp. 236, 272 of 485). She was diagnosed with neuropathy (Docket No. 11, pp. 238, 274 of 485).

On December 15, 2008, Plaintiff underwent a nerve conduction test which revealed minimal right carpal tunnel syndrome (Docket No. 11, pp. 239, 243, 244, 278, 469 of 485). Plaintiff returned to Dr. Singh on February 24, 2009, and May 14, 2009, still complaining of pain in her hands and feet (Docket No. 11, pp. 269, 410, 413 of 485). Dr. Singh again diagnosed her with neuropathy (Docket No. 11, p. 271 of 485) as well as arthritis, unspecified (Docket No. 11, p. 412 of 485). On May 15, 2009, Plaintiff underwent a radiology evaluation on both hands (Docket No. 11, p. 409 of 485). The study was unremarkable with no significant degenerative changes noted (Docket No. 11, p. 409 of 485).

Plaintiff reported to the Summa ER on August 3, 2009, complaining of rectal bleeding and pain that had lasted for one week (Docket No. 11, p. 383 of 485). At that time, Plaintiff claimed that she woke up and found her sheets covered in "approximately a cup of blood" (Docket No. 11, p. 383 of 485). Plaintiff's pelvic exam was normal and she was referred for an outpatient colonoscopy (Docket No. 11, p. 383 of 485). A week later, Plaintiff saw Dr. Andrew Mahoney, MD ("Dr. Mahoney") still complaining of rectal bleeding (Docket No. 11, p. 405 of 485). At that time, however, she denied having any bleeding since her visit to the emergency room (Docket No. 11, p. 405 of 485). Plaintiff

9

underwent an endoscopy and colonoscopy on October 20, 2009 (Docket No. 11, p. 356 of 495). Both tests were normal (Docket No. 11, p. 356 of 485).

Plaintiff returned to the Summa ER on June 21, 2010, complaining of right flank pain (Docket No. 11, p. 431 of 485). Plaintiff was diagnosed with right ureterolithiasis,[5] cystitis,[6] and a two-millimeter stone of the ureterovesical junction ("UVJ") (Docket No. 11, p. 431 of 485). She was given pain medication and discharged (Docket No. 11, p. 431 of 485).

On June 8, 2010, Plaintiff saw Dr. George Ilodi ("Dr. Ilodi") complaining of constant pain in her hands, arms, legs, left hip, and feet (Docket No. 11, p. 464 of 485). Dr. Ilodi diagnosed Plaintiff with neuropathy (Docket No. 11, p. 465 of 485). On July 28, 2010, Plaintiff saw Dr. Ryan Mills, DO ("Dr. Mills") still complaining of joint pain (Docket No. 11, p. 461 of 485). Plaintiff stated that she gets stiff after sitting for long periods and her pain is worse in the morning (Docket No. 11, p. 461 of 485). Dr. Mills confirmed the diagnosis of neuropathy (Docket No. 11, p. 462 of 485).

**b.    MENTAL HEALTH ISSUES**

Plaintiff's records indicate that she began seeing a psychiatrist from the Portage Path Barberton Clinic ("Portage Path") on November 18, 2008 (Docket No. 11, pp. 285, 355 of 485). On January 14, 2009, Plaintiff stated that she could not sleep at night (Docket No. 11, pp. 289, 349 of 485). Plaintiff was started on Risperdal for her psychotic symptoms and was also reported to be on Zoloft (for anxiety, panic attacks, and depression), Trazodone (for her insomnia), and Vistaril (for anxiety and insomnia)  (Docket No. 11, pp. 289, 349 of 485). On February 11, 2009, Plaintiff was started on Cogentin (Docket No. 11, pp. 294, 344 of 485). By March 18, 2009, Plaintiff reported that she was

---

[5] Development of a stone in the ureter. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

[6] Bladder inflammation usually occurring as a result of a urinary tract infection. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

doing well on her medications, her sleeping had improved, her mood was stable, and she was not

suffering from any hallucinations (Docket No. 11, p. 300 of 485). Portage Path notes from March 30,

2009, indicate that Plaintiff was compliant with her medications (Docket No. 11, p. 301 of 485).

On April 22, 2009, Plaintiff reported to Portage Path staff that she was feeling "just OK,"

although her mood was stable and she was sleeping well (Docket No. 11, p. 336 of 485). Plaintiff

reported hearing things again, specifically snakes, but was aware that the sounds could just be the wind

(Docket No. 11, p. 336 of 485). Plaintiff also reported that she was having some difficulty staying

focused (Docket No. 11, p. 336 of 485). By May 20, 2009, Plaintiff stated that she was hearing "snake

hissing" and was experiencing the sensation of something crawling on her body (Docket No. 11, p. 333

of 485). Plaintiff also reported having suicidal ideations that she could not talk herself out of; however,

she denied having any suicide plan or intent (Docket No. 11, p. 333 of 485). On June 2, 2009, Plaintiff

stated that she was hearing voices, despite her medication compliance (Docket No. 11, p. 330 of 485).

On January 10, 2010, Plaintiff was admitted to the Portage Path Crisis Stabilization Unit

(Docket No. 11, p. 416 of 485). Plaintiff was brought in by her boyfriend, who stated that Plaintiff was

paranoid (Docket No. 11, p. 417 of 485). Plaintiff was seen as alert, coherent, and rational with no

psychotic symptoms, delusions, hallucinations, or suicidal thoughts/behavior (Docket No. 11, p. 417 of

485). She was diagnosed with chronic depression, chronic adjustment disorder, and psychosocial

issues and assigned a Global Assessment of Functioning ("GAF") score of 70 (Docket No. 11, p. 418

of 485).[7]

---

[7] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall
level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 70
indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally
functioning pretty well, has some meaningful interpersonal relationships. THE DIAGNOSTIC AND STATISTICAL
MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

Plaintiff improved during her inpatient stay at Portage Path and was discharged on January 20, 2010 (Docket No. 11, p. 418 of 485). Plaintiff continued to receive mental health treatment at Portage Path but had numerous session cancellations and no-shows (Docket No. 11, pp. 285-483 of 485).[8]

## C.   EVALUATIONS

### 1.   INITIAL PSYCHIATRIC EVALUATION

On October 1, 2008, Plaintiff underwent an Initial Psychiatric Evaluation with staff at Portage Path (Docket No. 11, pp. 324-28 of 485). Plaintiff was well-groomed, made average eye contact, and had clear speech (Docket No. 11, p. 326 of 485). She was cooperative but seemed moderately withdrawn (Docket No. 11, p. 326 of 485). Plaintiff reported long-term depression, anxiety attacks, anhedonia, crying spells, and paranoia (Docket No. 11, p. 324 of 485). Plaintiff also reported a history of violence (Docket No. 11, p. 324 of 485). At age 22, Plaintiff stabbed a man in his neck and spent four and a half years in prison (Docket No. 11, p. 324 of 485). Plaintiff described a traumatic childhood, alleging sexual abuse by her grandmother's husband (Docket No. 11, p. 307 of 485), and stated that she thought it was her childhood that was the cause of her depression (Docket No. 11, p. 324 of 485). Based on this assessment, Plaintiff was diagnosed with major depressive disorder with psychotic features and posttraumatic stress disorder ("PTSD") (Docket No. 11, p. 327 of 485).

### 2.   PSYCHOLOGICAL EXAMINATION

On December 10, 2008, Plaintiff underwent a Psychological Examination with Dr. Frederick G. Leidal, Psy.D. ("Dr. Leidal") at the request of the Ohio Bureau of Disability Determination ("BDD")

---

[8] Plaintiff missed and/or cancelled seven psychotherapy appointments between November 18, 2008, and August 14, 2009: November 18, 2008 (Docket No. 11, pp. 285, 355 of 485); February 20, 2009 (Docket No. 11, pp. 298, 342 of 485); May 29, 2009 (Docket No. 11, p. 331 of 485); June 17, 2009 (Docket No. 11, pp. 329, 430 of 485); June 25, 2009 (Docket No. 11, p. 429 of 485); July 6, 2009 (Docket No. 11, p. 428 of 485); and August 14, 2009 (Docket No. 11, p. 426 of 485).

(Docket No. 11, p. 212 of 485). Plaintiff again acknowledged feeling despondent and depressed for most of her life, with wide moods swings, suicidal thoughts, and multiple suicide attempts (Docket No. 11, p. 214 of 485). She also acknowledged occasional visual and tactile hallucinations, seeing and feeling things crawling on her skin (Docket No. 11, p. 214 of 485). Plaintiff reported recurring paranoid thinking, believing that others are talking about and laughing at her (Docket No. 11, p. 214 of 485). Plaintiff denied any drug or alcohol problems, but acknowledged using marijuana from age thirteen until her mid-thirties, and using crack-cocaine from age nineteen until age thirty-five (Docket No. 11, p. 214 of 485). Plaintiff denied any unusual fears or phobias and there was no evidence of PTSD (Docket No. 11, p. 215 of 485).

Based on his interview, Dr. Leidal estimated Plaintiff's intelligence to be in the low average range (Docket No. 11, p. 216 of 485). Dr. Leidal noted that Plaintiff was capable of attending to activities of daily living such as getting out of bed, dressing, bathing, and taking care of personal hygiene needs, although the doctor noted that Plaintiff reported being inconsistent with these activities, only showering when she feels "scuzzy" (Docket No. 11, p. 216 of 485). Dr. Leidal concluded that Plaintiff was mildly impaired in her ability to understand and carry out detailed instructions and maintain pace in task completion (Docket No. 11, pp. 217-18 of 485). Plaintiff was moderately impaired in her ability to: (1) relate to others in an appropriate manner; (2) accept instruction or criticism and respond to instruction in the workplace; (3) respond to changes with reasonable flexibility; (4) work near others and not be overly distracted; (5) sustain an ordinary routine without supervision or prompting; (6) maintain persistence in completing daily or work-related tasks; (7) understand and comprehend and carry out more complex levels of instruction and direction; and (8) perform activities with a schedule and maintain attendance and punctuality (Docket No. 11, pp. 217-18

13

of 485). Plaintiff was moderately/markedly to markedly impaired in her ability to: (1) maintain

employment, adapt to the work environment and tolerate the stressors of the work environment and

complete a normal workday; and (2) manage money or benefits (Docket No. 11, p. 218 of 485).

Plaintiff's GAF score was 50 (Docket No. 11, p. 217 of 485).[9]

### 3.     MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On December 18, 2008, Plaintiff underwent a Mental Residual Functional Capacity

Assessment with state examiner Dr. John Waddell, Ph.D. ("Dr. Waddell") (Docket No. 11, pp. 260-63

of 485). Dr. Waddell found Plaintiff to be moderately limited in several categories, including

Plaintiff's ability to:

(1) complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; (2) interact appropriately with the general public; (3) accept instructions and respond

appropriately to criticism from supervisors; (4) get along with coworkers or peers without distracting

them or exhibiting behavioral extremes; and (5) respond appropriately to changes in the work setting

(Docket No. 11, p. 261 of 485).

### 4.     PSYCHIATRIC REVIEW TECHNIQUE

On the same day, Dr. Waddell also completed a Psychiatric Review Technique for Plaintiff

(Docket No. 11, pp. 246-59 of 485). Dr. Waddell noted that Plaintiff suffered from Bipolar Disorder,

Personality Disorder NOS, and ETOH (alcohol) Dependence (Docket No. 11, pp. 246-54 of 485). In

---

[9] A score of 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

assessing "Paragraph B" criteria,[10] Dr. Waddell found Plaintiff to have a mild degree of limitation with regard to her activities of daily living and moderate difficulty in maintaining social functioning as well as concentration, persistence, and pace (Docket No. 11, p. 256 of 485). Dr. Waddell found no episodes of decompensation (Docket No. 11, p. 256 of 485). Dr. Waddell did not find the presence of any "Paragraph C" criteria[11] (Docket No. 11, p. 257 of 485).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin,* 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin,* 475 F.3d at 730 (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin,* 475 F.3d at

---

[10] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[11] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

16

(*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Gaughen made

the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2010.

2.  Plaintiff has not engaged in substantial gainful activity since April 1, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: mood disorder variously diagnosed as depression and bipolar disorder, a personality disorder NOS with borderline, dependent, and antisocial traits, alcohol dependence, polysubstance abuse, peripheral neuropathy, minimal carpal tunnel syndrome in her right extremity, and obesity.

4.  Plaintiff's impairments, including the substance use disorder, meet sections 12.04, 12.08, and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  If Plaintiff stopped the substance abuse, the remaining limitations would cause more than a minimal impact on Plaintiff's ability to perform basic work activities; therefore, Plaintiff would continue to have a severe impairment or combination of impairments.

6.  If Plaintiff stopped the substance abuse, Plaintiff would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7.  If Plaintiff stopped the substance abuse, she would have the residual functional capacity to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) with the following limitations: (1) Plaintiff cannot perform any work activities that require strong gripping with her right upper extremity; (2) Plaintiff can only use her right upper extremity to perform fine manipulative actions, such as handling and fingering, for two-thirds or the workday and even then cannot do so continually; (3) Plaintiff can stand for approximately half of the workday but not all at once; (4) Plaintiff can sit for at least six hours during an eight-hour workday; (5) Plaintiff can work a full eight hours as long as she has a sit/stand option with normal breaks; (6) Plaintiff cannot perform tasks that involve the use of foot

17

controls; (7) Plaintiff can handle simple adjustment but, due to mental health concerns, cannot readily adapt to significant changes in routine; and (8) Plaintiff cannot work in an environment that requires higher-level social interactions, especially with new and unfamiliar people. She would perform best with a predictable, set routine to follow.

8.      If Plaintiff stopped the substance abuse, she would be unable to perform any past relevant work.

7.      Plaintiff was born on June 1, 1969, and was 39 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because Plaintiff's past relevant work is unskilled.

10.     If Plaintiff stopped the substance abuse, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.     Because Plaintiff would not be disabled if she stopped the substance use, Plaintiff's substance use disorder is a contributing factor material to the determination of disability. Thus, Plaintiff has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Docket No. 11, pp. 15-26 of 485). ALJ Gaughen denied Plaintiff's request for DIB and SSI benefits

(Docket No. 11, p. 26 of 485).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-

33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial

18

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that: (1) the ALJ's decision was not supported by substantial evidence and improperly relied on Plaintiff's alleged substance abuse; (2) the ALJ wrongly dismissed Plaintiff's subjective complaints; and (3) the ALJ failed to present an appropriate hypothetical to the VE (Docket No. 15, p. 10 of 19).

### B. DEFENDANT'S RESPONSE

Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff did not meet or medically exceed a mental listing, regardless of Plaintiff's alleged substance abuse (Docket No. 17, p. 8 of 15). Defendant also contends that the ALJ properly analyzed Plaintiff's credibility (Docket No. 17, p. 10 of 15). Finally, Defendant asserts that the ALJ properly included all relevant limitations in his hypothetical question (Docket No. 17, p. 13 of 15).

### C. DISCUSSION

19

1.    SUBSTANCE ABUSE

Under Social Security regulations, if the Commissioner "finds that [a claimant is] disabled and [has] medical evidence of [his] drug addition or alcoholism, [the Commissioner] must determine whether [his] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a). The key factor in determining whether drug addiction or alcoholism is a contributing material factor is whether the Commissioner would still find the claimant to be disabled if the claimant stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). The ALJ must evaluate which of the claimant's current impairments would remain if he stopped using drugs or alcohol and then determine whether any or all of the claimant's remaining limitations would continue to be disabling. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). If the remaining limitations are not disabling, the ALJ must find the claimant's drug or alcohol addiction to be a contributing factor material to the determination of disability and deny benefits. 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i).

Here, ALJ Gaughen found Plaintiff's substance use to be a contributing factor material to a determination of disability (Docket No. 11, p. 26 of 485). However, based on his review of the Plaintiff's medical record, ALJ Gaughen determined that if Plaintiff discontinued her drug use, she would not have an impairment, or any combination of impairments, that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Docket No. 11, p. 20 of 485).

Section 12.04 of the Listings describes affective disorders, which are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04. Section 12.08 deals with personality disorders, which exist when "personality traits are inflexible and maladaptive and cause either significant impairment in social or

occupational functioning or subjective distress." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.08.

Both listings require that a claimant have medically documented persistence, either continuous or intermittent, of certain enumerated symptoms that result in *marked* restriction/difficulty of at least two of the following: (1) activities of daily living; (2) maintaining social functioning; (3) maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpart P, Appendix 1, §§ 12.04, 12.08.

ALJ Gaughen determined that, absent her substance abuse, Plaintiff would have only a moderate restriction in activities of daily living (Docket No. 11, p. 21 of 485). In her December 2008 psychological evaluation with Dr. Leidal, Plaintiff indicated that she is capable of getting up in the morning, dressing, bathing, and taking care of her personal hygiene needs (Docket No. 11, p. 216 of 485). Plaintiff also stated that transportation is not a significant problem, despite the fact that she does not have a valid driver's license (Docket No. 11, p. 216 of 485). Plaintiff presented to the evaluation in appropriate dress with fair hygiene (Docket No. 11, p. 215 of 485). State examiner Dr. Waddell also found that Plaintiff had only a mild restriction with regard to activities of daily living (Docket No. 11, p. 256 of 485). During her initial psychiatric evaluation with Portage Path, Plaintiff appeared well-groomed (Docket No. 11, p. 326 of 485). These findings support no more than a moderate restriction in Plaintiff's activities of daily living.

With regard to social functioning, ALJ Gaughen opined that Plaintiff would have moderate difficulties (Docket No. 11, p. 21 of 485). Although Plaintiff testified that she has difficulty leaving the house and does not visit family or friends due to her paranoia and the fact that she does not like people (Docket No. 11, pp. 45, 213 of 485), Plaintiff also indicated that she can usually go to the grocery store (Docket No. 11, p. 46 of 485). Dr. Leidal noted that Plaintiff was "very conversant with several other

21

claimants that had been waiting to be seen, having no real trepidations or reservations" (Docket No. 11, p. 216 of 485). Plaintiff also reported that she lives with a friend (Docket No. 11, p. 44 of 485). In March 2010, Plaintiff reportedly started school and notes from Portage Path indicate that Plaintiff had "begun to be more assertive in interpersonal relationships" (Docket No. 11, p. 420 of 485). Dr. Waddell indicated that Plaintiff suffered from only moderate difficulties in maintaining social functioning (Docket No. 11, p. 256 of 485). Again, review of Plaintiff's records confirms only a moderate limitation with regard to social functioning, not enough to satisfy the "paragraph B" criteria.

Plaintiff's symptoms also fail to establish any more than a moderate limitation with regard to concentration, persistence, or pace. Both Dr. Leidal and Dr. Waddell found Plaintiff to be only mildly to moderately limited in her ability to maintain concentration, persistence, or pace (Docket No. 11, pp. 218, 256 of 485). Dr. Leidal noted that Plaintiff was able to attend to questions without becoming distracted or impaired (Docket No. 11, p. 216 of 485). Her general memory was fair and Plaintiff was able to count backwards from twenty and count by threes (Docket No. 11, p. 216 of 485). Plaintiff's executive functions related to simple planning were fair, as were her simple computation skills (Docket No. 11, p. 216 of 485). This review confirms only a mild to moderate limitation of Plaintiff's ability to maintain concentration, persistence, or pace.

Finally, with regard to episodes of decompensation, ALJ Gaughen determined that Plaintiff would likely suffer one to two episodes (Docket No. 11, p. 21 of 485). Episodes of decompensation are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. § 404, Subpart P, Appendix 1. Episodes of decompensation "may be inferred from medical records showing . . .

documentation of the need for a more structured psychological support system [such as] hospitalizations." 20 C.F.R. § 404, Subpart P, Appendix 1. The term "repeated" means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. § 404, Subpart P, Appendix 1.

Plaintiff's medical records document only one episode of decompensation that fits these requirements. Plaintiff was admitted to the Portage Path Crisis Stabilization Unit on January 10, 2010, for her paranoia (Docket No. 11, p. 416 of 485). Plaintiff improved during her stay and was discharged only ten days later, on January 20, 2010 (Docket No. 11, p. 418 of 485). Although Plaintiff mentioned additional inpatient and outpatient episodes (Docket No. 11, p. 317 of 485), there is nothing in the record to document these stays or Plaintiff's course of treatment. Plaintiff's one documented episode of decompensation fails to satisfy the criteria set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04 and 12.08

When viewed as a whole, it is clear that Plaintiff fails to satisfy the criteria set forth in sections 12.04 or 12.08 absent her substance abuse. Therefore, Plaintiff cannot be considered to be under a disability and this Magistrate recommends that the decision of the ALJ be affirmed.

## 2.      PLAINTIFF'S CREDIBILITY

Plaintiff next alleges that the ALJ erroneously discredited her subjective statements and allegations (Docket No. 11, pp. 13-15 of 19). Under Social Security regulations, a claimant's subjective complaints of pain or other symptoms are not, on their own, conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). However, a claimant may experience pain severe enough to restrict his ability to work. In such cases, an ALJ must evaluate the credibility of a claimant's allegations. Social Security Ruling 96-7p provides the framework under which an ALJ must analyze a

23

claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005).

Here, ALJ Gaughen accorded Plaintiff's subjective statements only partial credibility (Docket No. 11, pp. 20, 22-23 of 485). ALJ Gaughen found Plaintiff to be credible with regard to her description of her depressive symptoms such as anhedonia, psychomotor retardation, hallucinations and paranoid thinking, and sleep disturbances, as well as her description of a personality disorder, such as disturbances of mood and affect, unstable interpersonal relationships, and paranoid thinking (Docket No. 11, p. 20 of 485). However, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible (Docket No. 11, p. 23 of 485). A review of Plaintiff's medical record supports this conclusion.

Plaintiff first presented to Portage Path with complaints of depression, paranoia, and anxiety in September 2008 (Docket No. 11, p. 312 of 485). Plaintiff also reported visual and tactile hallucinations

24

at this time (Docket No. 11, p. 315 of 485). She was diagnosed with Psychotic Disorder NOS, Mood Disorder NOS, Impulse Control Disorder, Personality Disorder NOS, and Cocaine Dependency in full remission (Docket No. 11, p. 322 of 485). A second evaluation by Portage Path, conducted on December 15, 2008, diagnosed Plaintiff with PTSD, Major Depressive Disorder without psychotic features, and Borderline Personality Disorder (Docket No. 11, p. 310 of 485). Plaintiff's GAF score was 48 (Docket No. 11, p. 322 of 485).[12]

However, by January 2009, Plaintiff was reporting an improvement in her symptoms (Docket No. 11, p. 289 of 485). In February 2009, Plaintiff reported that her overall symptoms, anxiety and sleep had improved and that the "sounds" she was previously hearing had decreased and were very infrequent (Docket No. 11, p. 294 of 485). Portage Path records show that Plaintiff had seven cancelled or no-show appointments between November 18, 2008, and August 14, 2009 (Docket No. 11, pp. 285-429 of 485).

Furthermore, Plaintiff's account of her daily activities during her testimony is not consistent with the record as a whole and even her testimony itself. During her testimony, Plaintiff indicated that she spends her days "sitting down in front of the TV" (Docket No. 11, p. 45 of 485). However, she then indicated that she usually leaves the house once a day (Docket No. 11, p. 45 of 485). There is evidence in the record that Plaintiff prepares her own meals on a daily basis and babysits her granddaughter (Docket No. 11, pp. 141, 335 of 485). Additionally, Plaintiff reported to Dr. Leidal that she could not return to work because she just does not like being around people (Docket No. 11, p. 213 of 485). However, Plaintiff's records show that she went back to school in March 2010 (Docket No.

_____

[12] A score of 48 indicates serious symptoms or any serious impairment in social, occupational , or school functioning. DSM-IV at 34.

11, p. 420 of 485).

Even more telling of Plaintiff's credibility issues is her description of her history of drug abuse. Plaintiff indicated on multiple occasions that she had only experimented with drugs in the past (Docket No. 11, pp. 225, 406 of 485). During her evaluation with Dr. Leidal, Plaintiff flat-out denied any past drug use (Docket No. 11, p. 214 of 485). Plaintiff's statements are inconsistent with the record. During a September 15, 2008, evaluation at Portage Path, Plaintiff indicated that she last used crack on June 4, 2004 (Docket No. 11, p. 319 of 485). Plaintiff also reported that she had been using crack daily and used "as much as [she] could" (Docket No. 11, p. 319 of 485). During a December 2008 evaluation, Plaintiff indicated that she had been in jail for two years in 2005 for drug-related issues (Docket No. 11, p. 309 of 485). During that same evaluation, Plaintiff indicated that her relationship with her children had improved ever since she had stopped taking drugs (Docket No. 11, p. 310 of 485). Furthermore, Dr. Waddell diagnosed Plaintiff with ETOH Dependence (Docket No. 11, p. 254 of 485).

Based on a complete review of the record, it is clear that Plaintiff's credibility is less than perfect. Therefore, Plaintiff's second assignment of error is without merit and the Magistrate recommends that the ALJ's decision be affirmed.

### 3.    HYPOTHETICAL QUESTION

Finally, Plaintiff alleges that the ALJ failed to pose a hypothetical question based on the substantial evidence contained in the record (Docket No. 15, pp. 16-19 of 19). Specifically, Plaintiff alleges that the VE's testimony was flawed because the hypothetical question did not accurately portray the limitations caused by Plaintiff's mental impairments, most notably Plaintiff's ability to regularly show up to work or stay focused during the workday (Docket No. 15, pp. 16-17 of 19). In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be based on a

26

hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, ALJ Gaughen's hypothetical question included a number of limitations, including the need for occasional postural adjustments, a sit/stand option, no strong gripping with her dominant hand, sit/stand duration restrictions, no use of foot controls, and the need for a predictable routine (Docket No. 11, pp. 49-50 of 485). The ALJ also included the following restrictions: "she can handle simple adjustments at work, but due to mental health issues, can't readily or critically adapt to significant changes in the work setting or routine. And while she can handle perfunctory social interchange at work, can give a perfunctory or routine greeting to customers and co-workers, she's not going to be able to engage in higher level social interaction, especially with new and unfamiliar people" (Docket No. 11, p. 50 of 485).

Dr. Leidal's opinion stated that Plaintiff's ability to maintain attendance and be punctual is moderately impaired (Docket No. 11, p. 218 of 485). Dr. Leidal also opined that Plaintiff's ability to maintain attention and concentration on simple work tasks or to carry out a simple repetitive task is not impaired (Docket No. 11, p. 218 of 485). Dr. Waddell indicated that Plaintiff's ability to understand and remember very short and simple instructions was not impaired, nor was her ability to maintain attention and concentration for extended periods (Docket No. 11, p. 260 of 485). Dr. Waddell also opined that Plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual was not significantly limited (Docket No. 11, p. 260 of 485). Aside from Plaintiff's

27

testimony that she *sometimes* has difficulty focusing for long periods of time (Docket No. 11, p. 45 of 485), there is no other evidence in the record to suggest that Plaintiff would have difficulty appearing for or staying focused during work. Therefore, Plaintiff's third assignment of error lacks merit and the Magistrate recommends that the decision of the ALJ be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   February 20, 2013

28

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.